719 S.E.2d 394

**GRANT THORNTON, LLP, Plaintiff Below, Petitioner**

v.

**KUTAK ROCK, LLP, Defendant Below, Respondent.**

No. 11–0079.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 18, 2011.

Decided Nov. 16, 2011.

John H. Tinney, Esq., John K. Cecil, Esq., The Tinney Law Firm, PLLC, Charleston, WV, for Grant Thornton, LLP.

David B. Thomas, Esq., Stephanie D. Thacker, Esq., Debra C. Price, Esq., Guthrie & Thomas, PLLC, Charleston, WV, for Kutak Rock, LLP.

KETCHUM, J.:

This action is before this Court upon the appeal of the plaintiff below, Grant Thornton, LLP, from the order of the Circuit Court of McDowell County denying its motion to alter or amend the summary judgment granted in favor of the defendant below, Kutak Rock, LLP. Grant Thornton ("accounting firm"), a large, independent business retained to perform an external audit of the First National Bank of Keystone ("Keystone"), filed an action against Kutak, a multistate law firm ("law firm"), alleging fraud, negligent misrepresentation and tortious interference with the accounting firm's contract to perform the audit. The action is one of the many and diverse lawsuits arising from Keystone's operation, insolvency and closure. Much of the litigation has taken place in the federal courts.

In granting summary judgment, the circuit court concluded that the accounting firm's claims against the law firm in this action are, in reality, claims for contribution as between joint tortfeasors rather than direct or independent claims and, as such, are barred by a prior, good faith settlement between the law firm and the FDIC relating to the Keystone collapse.

The record in this matter is voluminous and includes an extensive number of pleadings, transcripts and exhibits. Upon careful review, this Court is of the opinion that the

circuit court correctly determined that the accounting firm's claims are barred by the settlement. Those claims arose in litigation in the United States District Court for the Southern District of West Virginia in which the accounting firm was found liable to the FDIC for accounting malpractice based on negligence, with the verdict against the accounting firm partially reduced by a credit from the law firm-FDIC settlement. Accordingly, and for the reasons stated below, this Court affirms the summary judgment in favor of the law firm and the denial of the accounting firm's motion to alter or amend.

## I.

### Factual Background

In 1992, Keystone, a small, rural bank in McDowell County, adopted a growth strategy known as "securitization." Pursuant to that strategy, Keystone, over a period of time, acquired a large number of real estate mortgage loans from sources throughout the country, pooled the loans in groups and sold interests in the pools to various investors. The pooled loans were serviced by third-party entities, such as Advanta and Compu-Link. Keystone retained a residual interest in each loan securitization. Fatal to Keystone's securitization strategy, however, was the fact that the underlying mortgage loans were high risk or high loan-to-value and included many borrowers who were substantially leveraged with little collateral. The failure rate on the loans was excessive. Nevertheless, securitization became Keystone's principal business.

In response to the problem, certain members of Keystone's management fraudulently concealed the Bank's financial condition from Keystone's Board of Directors, federal regulators and the public. The Bank's records were falsified, and, in one instance, $515 million in loans sold by Keystone continued to be carried on the records as an asset. The concealment was perpetuated for a number of years despite a deteriorating relationship between Keystone and the federal Office of the Comptroller of the Currency. In 1998,

Keystone reached an agreement with the Comptroller whereby Keystone would retain an independent accounting firm to audit the Bank's records. As a result, the accounting firm, Grant Thornton, was hired to conduct an external audit, pursuant to generally accepted auditing standards, of Keystone's consolidated financial statements as of December 31, 1998. As noted in the federal court decisions discussed below, the accounting firm knew, at the time of its engagement, that Keystone had significant accounting problems and that heavy regulatory oversight was the reason for its engagement. In accepting the assignment, the accounting firm rated the Keystone audit maximum risk.

Nevertheless, the accounting firm concluded that Keystone's financial papers were free of material misstatement and issued a "clean audit" concerning the Bank on April 19, 1999. Keystone, thus, continued to operate though, in reality, it was hemorrhaging losses and hopelessly insolvent. Soon after, the concealment scheme perpetrated by Keystone's managers unraveled when the Office of the Comptroller discovered that the Bank had overstated its assets by over $500 million. On September 1, 1999, the Comptroller closed Keystone. The Federal Deposit Insurance Corporation was appointed the Bank's receiver. It is undisputed that the accounting firm was negligent in performing the audit. Its conduct concerning the audit has been described as "strikingly incompetent." [1]

The Keystone collapse cost the FDIC millions of dollars to resolve. An investigation of the collapse led the FDIC to assert claims against the accounting firm and the Kutak law firm.

In terms of the time frame and the amount of damages sought by the FDIC, the responsibility of the law firm in the collapse of the Keystone Bank was much greater than that of the Grant Thornton accounting firm. The law firm, a multistate enterprise, began representing Keystone in 1993. Attorney Michael Lambert was the law firm's partner in

1. *Grant Thornton, LLP v. Office of the Comptroller of the Currency,* 514 F.3d 1328, 1341 (D.C.Cir. 2008) (Henderson, J., concurring).

charge of the representation. The representation continued until Keystone's closure in 1999, and the legal services provided principally concerned the Bank's securitization program. As determined in subsequent litigation, however, attorney Lambert, throughout the representation, failed to inform Keystone's Board of Directors of a number of "red flags" which would have revealed considerable irregularities in the program and would have revealed the Bank's troubled financial condition. Upon investigation, the FDIC concluded that legal malpractice had occurred, resulting in substantial damages. Lambert is currently banned from representing FDIC insured banks.

Prior to the FDIC filing an action against the law firm, a written agreement was reached in May 2003 settling the FDIC claims against both the law firm and Lambert for $22 million. Pursuant to the agreement, the FDIC released the law firm and Lambert from any and all actions "which exist now or may arise in the future, arising out of or relating in any way, either directly or indirectly ... to the representation of Keystone by Kutak Rock, including Lambert (collectively, the 'FDIC Claims')." The agreement further provided that "[t]he FDIC and/or Kutak Rock may move the Court in an appropriate proceeding ... for an order finding that ... the Settlement Agreement bars contribution and indemnification claims now and in the future against Kutak Rock and/or Lambert by non-settling parties." As stated in the agreement, and later confirmed in federal court litigation, the settlement was entered into in good faith.

## II.

### Federal Court Litigation

In reviewing the appropriateness of the rulings made by the Circuit Court of McDowell County, an understanding of the FDIC litigation against the Grant Thornton ac-counting firm in federal court and its relation to the FDIC-law firm settlement is essential.

Alleging negligence against the accounting firm, the FDIC intervened in Keystone-related litigation in the Southern District of West Virginia. The litigation culminated initially in *Grant Thornton, LLP v. Federal Deposit Insurance Corporation*, 535 F.Supp.2d 676 (S.D.W.Va.2007). In that action, the accounting firm moved for leave to file a third-party complaint against the law firm alleging contribution; fraud; negligent misrepresentation; and tortious interference with contract. The District Court denied the motion and stated:

> Given that [the accounting firm] Grant Thornton has conceded the good faith nature of the settlement and the fact that the amount of the settlement has been disclosed to the court, it is clear that Grant Thornton's contribution claims against [the law firm] Kutak Rock have been extinguished. * * * Accordingly, if and when a judgment is entered against Grant Thornton, Grant Thornton will receive dollar-for-dollar credit *to the extent* the claims against itself and Kutak Rock were based on a single, indivisible loss. * * * Any direct claims Grant Thornton has against Kutak Rock may be addressed in another lawsuit.

(emphasis in the original)

Thereafter, the District Court conducted a bench trial, and in an opinion filed on March 14, 2007, the District Court held the accounting firm liable to the FDIC for accounting malpractice, based on negligence, in the amount of $25,080,777. The measure of damages was the Bank's net operating expenses incurred after the issuance of the audit report in April 1999 until the Bank's closure on September 1, 1999.[2] Nevertheless, the District Court held judgment for the FDIC in abeyance until the amount of the accounting

---

2. The District Court stated:
 FDIC has proved that if Grant Thornton had followed GAAS [Generally Accepted Auditing Standards], it would have discovered and reported the fraud and insolvency of Keystone before April 19, 1999, which would have led to immediate closure of the Bank. Grant Thorn-ton's failure to follow GAAS thus resulted in the prolongation of the life of the Bank for the period from April 21, 1999 [shortly after the audit was issued] until September 1, 1999, a time during which the Bank continued to incur significant net operating losses.
 535 F.Supp.2d at 710.

firm's credit regarding the FDIC-law firm settlement could be determined.

In finding liability, the District Court determined that the accounting firm issued a "clean opinion" audit without having adequate evidence to support the opinion and having "substantial evidence that contradicted the opinion." 535 F.Supp.2d at 695. Keystone's financial statements prior to the issuance of the audit reflected more than $500 million in loans that were not, in fact, owned by Keystone. In one instance, a Grant Thornton auditor failed to pursue a $236 million discrepancy in loans serviced on behalf of the Bank by Advanta. The auditor had been provided with information that Advanta was servicing $6 million in loans owned by Keystone, rather than the $242 million in loans the Bank was reporting. Had the accounting firm investigated the discrepancy, the fraud would have been discovered, and the Bank would have been closed sooner. Moreover, the District Court concluded that the auditor's subsequent testimony about this matter "was not entirely truthful." 535 F.Supp.2d at 691. Another instance concerned the accounting firm's failure to independently verify interest income, millions of dollars of which, though reported by Keystone, was nonexistent. In that regard, the District Court emphasized that, even though the accounting firm was aware of the high risk of misstatement or fraud, it performed an interest income analysis on data that "was not independent of the entity [and] was not from a person independent of those responsible for the amount being audited[.]" 535 F.Supp.2d at 684. Finally, the District Court noted how quickly, following the audit, further investigation by federal regulators uncovered the misconduct of the Bank's managers. By August 1999, the regulators discovered Keystone's ability to manipulate servicer reports and the overstatement of assets in excess of $500 million.

Upon the motion of the accounting firm for a settlement credit, additional evidence was taken, and on March 10, 2010, the District Court filed a supplemental decision: *Grant Thornton, LLP v. Federal Deposit Insurance Corporation*, 694 F.Supp.2d 506 (S.D.W.Va. 2010). The District Court had previously indicated that the accounting firm would receive a credit to the extent the claims against it and the Kutak law firm were based on a "single, indivisible loss." Consequently, the District Court determined that, although the law firm (representing Keystone from 1993 to 1999) was responsible for causing all of the damages to the Bank, the accounting firm had caused only part of the damages, with the indivisible or joint damages caused by the law firm and the accounting firm being the $25,080.777.

As calculated by the District Court, the $25,080,777 was only 8.563% of the total damages incurred by Keystone. Therefore, the accounting firm was only entitled to credit for a portion of the amount for which the law firm and Lambert had settled, i.e., a credit of less than $2 million. The District Court explained: "[T]he damages that Kutak settled encompass a period of time greater than that for which [the accounting firm] Grant Thornton was found liable. In this case while there is an overlap in damages it does not prohibit the court from making an allocation." 694 F.Supp.2d at 530. In other words, the $22 million FDIC-law firm settlement did not relate solely to the Bank's operating losses incurred after the audit was issued by the accounting firm. Instead, only a portion of the FDIC-law firm settlement would relate to the joint damages caused by the law firm and the accounting firm after the audit was issued.

On appeal, the United States Court of Appeals, Fourth Circuit, in *Grant Thornton, LLP v. Federal Deposit Insurance Corporation*, 2011 WL 2420264 (4th Cir.2011), made a relatively small mathematical adjustment to the settlement credit and, in all other respects, upheld the District Court. The Court of Appeals noted:

We find it particularly significant in this case that [the accounting firm] Grant Thornton was hired to perform the audit, not in the ordinary course, but at the insistence of federal regulators who were closely watching Keystone. * * * [P]rior to the audit report being issued, Grant Thornton had characterized the audit as a "highest maximum risk" audit, its highest risk category; this risk category required

certain additional steps and tests be conducted, some of which [Grant Thornton] simply failed to perform[.]

Moreover, the Court of Appeals noted that the post-audit actions of Keystone's managers were not a "new effective cause," did not operate independently of the accounting firm's negligence and, therefore, did not constitute a superseding cause of the Bank's damages.

## III.

### The McDowell County Action

On February 10, 2004, the Grant Thornton accounting firm filed the current action against the Kutak law firm seeking recovery for fraud, negligent misrepresentation and tortious interference with the accounting firm's contract to perform the audit. The complaint alleged:

> Lambert knew that Keystone's books fraudulently overstated its loan portfolio by a substantial amount. Despite knowing about this fraud, Lambert made material false statements, misrepresentations and omissions to Grant Thornton (and others, including Keystone's board of directors) about Keystone's financial condition.
> * * *
> Through his affirmative statements and through his failure to disclose material information required to make his affirmative statements not misleading, Lambert falsely indicated that he believed that loan portfolio balances reported in Keystone's financial records, and repeated in Call Reports to the [Office of the Comptroller], were accurate.

Although the complaint sets forth claims for compensatory and punitive damages, at-torney fees and expenses, those demands were amended pursuant to an agreed order entered by the circuit court in November 2008. The order reflected the stipulation that the accounting firm would withdraw any damage claims against the law firm for injury to reputation, loss of goodwill and disruption of its business. The stipulation further provided that the accounting firm would pursue the Kutak law firm for any damages which it is required to pay the FDIC and for legal fees and expenses incurred during the defense of the Keystone litigation.[3]

■ In the course of the action the law firm filed a motion for summary judgment. The accounting firm filed a response, and a number of exhibits were submitted by the parties. By order entered on March 11, 2010, the circuit court granted summary judgment in favor of the law firm. In the order, the circuit court indicated that the law firm had a duty to the accounting firm to disclose information concerning Keystone, since the Bank was a common client of the law firm and the accounting firm on common issues.[4] However, the circuit court concluded that the claims of the accounting firm against the law firm in the McDowell County action were, in reality, contribution claims rather than direct or independent claims and were, therefore, barred by the May 2003 settlement agreement between the FDIC and the law firm. The legal basis cited by the circuit court for its ruling was *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990), syllabus point 6 of which holds: "A party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribu-

---

**3.** As clarified by the accounting firm, the legal fees and expenses it seeks are independent of its claim for compensatory and punitive damages because the legal fees and expenses, more broadly, concern a number of collateral actions or proceedings arising from the Keystone collapse. Those matters include responding to inquiries from the Office of the Comptroller and litigation the accounting firm settled or tried to verdict.

**4.** Though not cited by the circuit court, Rule 4.1. of the West Virginia Rules of Professional Conduct states:

> In the course of representing a client a lawyer shall not knowingly:
> (a) make a false statement of material fact or law to a third person; or
> (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6. [concerning confidentiality, generally, between a lawyer and a client].

tion." Syl. pt. 2, *Smith v. Monongahela Power Company*, 189 W.Va. 237, 429 S.E.2d 643 (1993). The order stated:

> The acts of both Kutak and Grant Thornton resulted in a single, indivisible injury. Kutak and Grant Thornton were joint tortfeasors. Kutak entered into a good faith settlement with the FDIC. [The accounting firm] Grant Thornton did not and chose to go to trial. Now Grant Thornton wants judgment against [the law firm] Kutak for the amount of the judgment against them, plus their attorney fees. If allowed, this would make Kutak pay for both their liability and Grant Thornton's liability. In effect, this would make Kutak pay for Grant Thornton's wrongdoing, as found by the District Court. Grant Thornton would not even have the cost of their own attorney fees, except for this case. This would place a chilling effect on settlements, and settlements would cease to exist.

On August 31, 2010, the circuit court entered an order denying the accounting firm's motion to alter or amend the summary judgment. The circuit court confirmed its conclusion that this Court's opinion in *Zando, Martin & Milstead* articulated the controlling law in this action, warranting the ruling in favor of the Kutak law firm. The appeal to this Court followed.

## IV.

### Standard of Review

The accounting firm appeals from the denial of its motion to alter or amend the summary judgment granted in favor of the Kutak law firm. The applicable standard of review, therefore, concerns the summary judgment itself. Syl. pt. 1, *Wickland v. American Travellers Life Insurance Company*, 204 W.Va. 430, 513 S.E.2d 657 (1998).

 This Court's standard of review concerning summary judgments is well settled. Syllabus point 3 of *Aetna Casualty and Surety Company v. Federal Insurance Company of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963), holds: "A motion for summary judgment should be granted only when it is

clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 1, *Mueller v. American Electric Power Energy Services*, 214 W.Va. 390, 589 S.E.2d 532 (2003). *See also, Southern Electrical Supply v. Raleigh County National Bank*, 173 W.Va. 780, 782, 320 S.E.2d 515, 517 (1984) (Summary judgment is appropriate where there are no genuine issues of material fact in dispute, and the matter can be decided by application of rules of law.).

 Upon appeal, the entry of a summary judgment is reviewed by this Court *de novo*. *Angelucci v. Fairmont General Hospital*, 217 W.Va. 364, 368, 618 S.E.2d 373, 377 (2005). As noted in *Merrill v. Department of Health and Human Resources*, 219 W.Va. 151, 155, 632 S.E.2d 307, 311 (2006): "In conducting our *de novo* review, we apply the same standard for granting summary judgment that is applied by the circuit court."

## V.

### Discussion

The Grant Thornton accounting firm acknowledges that it was a joint tortfeasor with the law firm and that, beyond its demand for legal fees and expenses, it seeks reimbursement of its liability to the FDIC. The accounting firm contends, however, that those circumstances do not transform the current action into a barred claim for contribution. Rather, it contends that the current action alleges direct or independent claims by the accounting firm against the law firm, i.e., claims which are not derivative through the parties' joint liability to the FDIC. According to the accounting firm, the entry of summary judgment was error because the Kutak law firm engaged in direct conduct against the accounting firm in the form of fraud, negligent misrepresentation and tortious interference with the accounting firm's contract to perform the audit. That conduct was actionable and not affected by the FDIC-law firm settlement or the subsequent credit allowed the accounting firm on the adverse verdict returned in the District Court.[5]

---

5. It should be noted that the accounting firm

does not seek recovery in this action based on a

The law firm's direct conduct against the accounting firm allegedly included misrepresenting the accuracy of information regarding Keystone's financial condition and the disaffirmation of unasserted possible claims against the Bank by others. The accounting firm urges the latter point as especially significant. By letter dated March 1, 1999, Lambert responded to the accounting firm's request for information concerning the Bank's financial statements. The letter disclosed several pending matters, including an action filed by City National Bank in the Circuit Court of Kanawha County, West Virginia, against Keystone alleging, *inter alia*, breach of contract and "intentional and/or negligent misrepresentation." With regard to prospective claims, however, the letter stated: "We confirm as correct the Bank's representation to you that there are no unasserted possible claims with respect to which we have advised the Bank of a probability of assertion and which must be disclosed in accordance with [Financial Accounting Standards]." The accounting firm alleges that the law firm's assurance of no unasserted possible claims was materially false and failed to disclose that, in view of the Bank's true condition, possible claims by depositors, lenders, shareholders, government regulators and others were on the horizon.

The Kutak law firm, on the other hand, emphasizes that the accounting firm's complaint expressly embraced the federal litigation, thus revealing that the current action emanates from the facts and circumstances which were before the District Court. Following a lengthy and complex bench trial, the District Court determined that a portion of the testimony presented by one of the accounting firm's auditors "was not entirely truthful" and ultimately held that the accounting firm was liable to the FDIC for accounting malpractice. In particular, the

law firm asserts that the accounting firm, as an independent auditor, failed to utilize independent sources to verify the data it collected concerning Keystone's financial condition, thereby failing to fulfill its duty, derivative of the mandate of the Office of the Comptroller, to complete a proper audit. The accounting firm was well aware of the heavy regulatory oversight surrounding Keystone and the high risk of transgressions with which it would have to contend. Nevertheless, the accounting firm became an adjudicated tortfeasor, and, according to the law firm, it is attempting to deny the law firm the benefit of its good faith settlement by seeking, in this action, to shift its responsibility for the FDIC verdict to the law firm. Consequently, the law firm concludes: "Litigants would be loath to settle, knowing that even a good faith settlement could nonetheless expose them to years of additional litigation from acknowledged joint tortfeasors and adjudicated wrongdoers that recast their barred contribution claims as so-called 'independent' claims or duties."

■ In *Zando, Martin & Milstead, supra,* relied on by the circuit court, the McDowell County Board of Education filed an action against an architectural and engineering firm for damages resulting from the defective construction of a high school. A verdict was returned against the architectural and engineering firm for $1,000,000. The Board of Education, prior to the verdict's return, had settled with two other entities: a soil testing company and a general contractor. In *Zando,* this Court affirmed the dismissal of the claims for contribution filed by the architectural and engineering firm (the non-settling defendant) but reversed the denial of the firm's request for a settlement credit against the $1,000,000 verdict. In so holding, this Court expressed the following principle in syllabus point 8:

---

theory of express or implied indemnity. In the petition for appeal filed in this Court, the accounting firm states that it "has not asserted an indemnity claim in this suit." Rather, the accounting firm argues that the unavailability of contribution and indemnity are irrelevant to its direct claims against the law firm. In any event, the accounting firm also states in the petition for appeal that the District Court's finding of negligence against it "precluded it from suing Kutak

for indemnity." *See, Dunn v. Kanawha County Board of Education,* 194 W.Va. 40, 47, 459 S.E.2d 151, 158 (1995) (The right to seek implied indemnity belongs only to a party who is without fault.); syl. pt. 2, *Sydenstricker v. Unipunch Products, Inc.,* 169 W.Va. 440, 288 S.E.2d 511 (1982) ("Implied indemnity is based upon principles of equity and restitution and one must be without fault to obtain implied indemnity.").

Where there is a single indivisible loss arising from the actions of multiple parties who have contributed to the loss, the fact that different theories of liability have been asserted against them does not foreclose their right of contribution *inter se* or prevent them from obtaining a verdict credit for settlements made with the plaintiff by one or more of those jointly responsible.

Syl. pt. 4, *Pennington v. Bluefield Orthopedics,* 187 W.Va. 344, 419 S.E.2d 8 (1992).

■ As stated above, syllabus point 6 of *Zando* held that "[a] party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribution." Thus, indicating that the settlements of the soil testing company and the general contractor were made in good faith, this Court upheld the dismissal of the architectural and engineering firm's contribution claims but also concluded that the firm was entitled to a reduction of the verdict to reflect the settlements which were reached in satisfaction of the Board of Education's loss. Syllabus point 7 of *Zando* states in part: "Defendants in a civil action against whom a verdict is rendered are entitled to have the verdict reduced by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties."

■ In *Zando,* this Court noted that the good faith settlement bar to claims for contribution advances the policy in this jurisdiction of dispute resolution by compromise and settlement rather than by litigation.[6] Cited with approval, in *Zando,* is the following comment:

As the California Court of Appeals stated in *Stambaugh v. Superior Court,* 62 Cal. App.3d 231, 236, 132 Cal.Rptr. 843, 846 (1976): "Few things would be better calculated to ... discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would but lead to further litigation with one's joint tortfeasors, and perhaps further liability."

"No defendant wants to settle when he remains open to contributions in an uncertain amount, to be determined on the basis of a judgment against another in a suit to which he will not be a party." Unif. Contribution Among Tortfeasors Act, 1955, § 4(b), comment, 12 U.L.A. at 99.

182 W.Va. at 604–05, 390 S.E.2d at 803–04.

The *Zando* opinion was later cited in *Jennings v. Farmers Mutual Insurance Company,* 224 W.Va. 636, 687 S.E.2d 574 (2009), relied on by the accounting firm in the current matter. In *Jennings,* an insured brought an action against her insurance company and its agent arising from the refusal to pay insurance proceeds following a fire loss. Holding that a good faith settlement had extinguished the contribution claim of the insurance company against its agent, this Court upheld the granting of the agent's motion for summary judgment. This Court also upheld summary judgment in favor of the agent with regard to the insurance company's cross-claim against the agent for misrepresentation: i.e., the agent had allegedly provided the company with inaccurate or incomplete information on the application for insurance he had completed for the insured. This Court concluded as a matter of law, as did the court below, that the alleged acts or omissions of the agent concerning the application had not been detrimentally relied upon by the insurance company in issuing the policy.

The accounting firm contends that this Court, in *Jennings,* recognized the validity of direct claims between joint tortfeasors, independent of claims for contribution, by implying that, had the evidence of detrimental reliance by the insurance company been stronger or more fully developed, the claim of the insurance company against the agent could have gone forward. We point out, however, that *Jennings* was a *per curiam* opinion that neither attempted to extend the rule of law set forth in *Zando* nor discuss the conclusion urged by the Grant Thornton ac-

---

6. *See,* syl. pt. 1, *in part, Sanders v. Roselawn Memorial Gardens,* 152 W.Va. 91, 159 S.E.2d 784 (1968) ("The law favors and encourages the reso-

lution of controversies by contracts of compromise and settlement rather than by litigation.").

counting firm except upon an evidentiary basis.[7]

■ In considering contribution claims versus direct or independent claims in the circumstances before us, the following observation found in *Zando* is helpful: "The touchstone of the right of inchoate contribution is this inquiry: Did the party against whom contribution is sought breach a duty to the plaintiff which caused or contributed to the plaintiff's damages?" 182 W.Va. at 603, 390 S.E.2d at 802.

One important aspect pertaining to Keystone's failing securitization program prior to the Bank's closure is the distinction between the Bank's managers and its Board of Directors. As the Bank became hopelessly insolvent, certain members of Keystone's management fraudulently concealed the Bank's financial condition from various members of the Board of Directors. In that regard, the import of the accounting firm's allegations in this action against the Kutak law firm is that the alleged misconduct committed by the law firm relating to the Bank's finances was largely in conjunction with the misconduct of Keystone's management. Therefore, if the law firm harmed the Grant Thornton accounting firm, those acts also harmed Keystone's Board of Directors, the Bank's customers and, ultimately, the FDIC. The March 1, 1999, letter sent to the accounting firm by Michael Lambert of Kutak was purportedly written on behalf of the Bank. Moreover, as indicated above, the accounting firm's McDowell County complaint alleged that Lambert's misconduct was directed at the accounting firm "*and others, including Keystone's board of directors*" concerning Keystone's financial condition. (emphasis added)

Moreover, the law firm's alleged acts of misconduct did not run parallel to the auditing responsibilities of the Grant Thornton accounting firm. The legal representation provided to Keystone and the independent audit served different functions. That is illustrated in a striking way by the fact that the mandate for the independent audit of Keystone originated with the Office of the Comptroller of the Currency and by the fact that, when it agreed to do the audit, the accounting firm knew that Keystone had significant accounting problems and that heavy regulatory oversight was the reason for its engagement. In accepting the assignment, the accounting firm rated the Keystone audit maximum risk. Nevertheless, after the accounting firm issued the "clean audit," the District Court determined that the audit lacked adequate evidentiary support. A key example in that determination was the accounting firm's failure to utilize independent sources to verify reported interest income. Moreover, the District Court determined that the accounting firm had "substantial evidence that contradicted" its audit. A key example in that determination was the failure to pursue a $236 million discrepancy in loans serviced on behalf of the Bank by Advanta, where a Grant Thornton auditor had been provided with information that Advanta was servicing $6 million in loans owned by Keystone, rather than the $242 million in loans Keystone was reporting.

Noting that an auditor should have a "show me" attitude, the District Court concluded that the accounting firm "had many reasons to employ a heightened professional skepticism in its audit of Keystone's financial statements" and that "confirming the existence of the loans was among Grant Thornton's chief duties." 535 F.Supp.2d at 683, 702.[8] As later emphasized by the Court of

---

7. In the current action, the order denying the accounting firm's motion to alter or amend noted that *Jennings* was a *per curiam* opinion that did not alter the principles set forth in *Zando, Martin & Milstead.* *See, Stanley v. Department of Tax and Revenue*, 217 W.Va. 65, 71, 614 S.E.2d 712, 718 (2005), footnote 4 of which states in part: "*Per curiam* opinions have precedential value as an application of settled principles of law to facts, but this Court will use signed opinions when new principles of law are announced."

8. In an instance described by the District Court, a Keystone employee with no previous work experience in the banking industry testified that where United Bank was paid the principal balance, the accrued interest and the premium on the loan, it seemed that United Bank owned the loan. The District Court noted that that testimony illustrated the ease with which the fraud could have been discovered had the accounting firm made a proper inquiry of the servicers, United Bank and even the Keystone employee. 535 F.Supp.2d at 702.

Appeals in *Grant Thornton, LLP v. Federal Deposit Insurance Corporation*, 2011 WL 2420264, *supra:* "We find it particularly significant in this case that Grant Thornton was hired to perform the audit, not in the ordinary course, but at the insistence of federal regulators who were closely watching Keystone." *See, United States v. Arthur Young & Co.*, 465 U.S. 805, 817, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826, 836 (1984) (By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client.).

▮ Accordingly, this Court holds that an independent accounting firm, as a non-settling defendant, found liable to the Federal Deposit Insurance Corporation for a negligent bank audit, may not file a subsequent action against the bank's law firm alleging direct claims for fraud, negligent misrepresentation and tortious interference with contract where: (1) the law firm, as a joint tortfeasor, executed a prior, good faith settlement with the FDIC, thereby extinguishing the accounting firm's right of contribution, (2) the accounting firm was awarded a credit reduction on the verdict based on the settlement, (3) the direct claims alleged by the accounting firm arose from the same facts and circumstances which contributed to the bank's loss and resulted in the judgment obtained by the FDIC, (4) the damages sought by the accounting firm against the law firm are substantially the same as the judgment obtained by the FDIC, (5) the accounting firm knew in advance that the audit would involve a high risk of misrepresentation of data by bank managers and (6) the engagement of the accounting firm to perform the audit, originating through the Office of the Comptroller of the Currency, served a public function.

In the order granting summary judgment, the circuit court artfully stated:

Although [the accounting firm] Grant Thornton now contends its claims against [the law firm] Kutak in this Court are "independent," it seeks to recover the same, indivisible damages from Kutak for which it was awarded a set-off in the FDIC Federal Court Action. Moreover, while arguing that its claims against Kutak for fraud, tortious interference and negligent misrepresentation are "direct" and based upon Kutak's violation of "independent duties" to Grant Thornton, Grant Thornton simultaneously undermines its own position by arguing that it suffered no injury with regard to the FDIC claims until the FDIC filed suit against Grant Thornton. The Court finds that Grant Thornton's claims against Kutak are not "independent" claims, but are contribution claims which are barred by Kutak's good faith settlement with the FDIC.

By that same reasoning, this Court is of the opinion that the accounting firm's claim against the law firm for collateral legal fees and expenses is without merit.

## VI.

### Conclusion

For the reasons stated above, this Court concludes that the Circuit Court of McDowell County correctly determined that the claims of the Grant Thornton accounting firm against the Kutak law firm in this action are, in reality, contribution claims rather than direct or independent claims and are, therefore, barred by the May 2003 settlement agreement made in good faith between Kutak and the FDIC. Consequently, this Court affirms the March 11, 2010, summary judgment granted in favor of Kutak and the August 31, 2010, denial of Grant Thornton's motion to alter or amend the judgment.

Affirmed.

Justice BENJAMIN disqualified.

Justice McHUGH disqualified.

Judge JOSEPH C. POMPONIO, JR., Chief Judge of the 11th Circuit, sitting by temporary assignment.